## HICKMAN et al. v. HICKMAN et al.
### No. 2879.

Court of Civil Appeals of Texas.  Eastland.
Nov. 2, 1951.

Rehearing Denied Dec. 14, 1951.

682

Hope Hickman, who are respectively wife and infant child of Hector H. Hickman, deceased. The trial in the District Court was before a jury which found that on August 25, 1948, the date of the execution of the will, the testator, Hector H. Hickman, (1) was not of sound mind, and (2) was not acting under undue influence of Roy N. Hickman, Bernal B. Hickman, I. N. Hickman and Mrs. Ellis, or either of them. Based upon the jury finding that the testator was not of sound mind at the time of the execution of the will, judgment was entered for appellees denying the probate thereof. From such judgment, appellants have duly perfected their appeal.

Appellants' first and second points urge that the verdict of the jury and judgment of the court are unsupported by the evidence; that no witness offered any evidence of probative force "that Hector H. Hickman was of unsound mind, but that all the witnesses who testified as to his mental condition asserted that his mind was sound."

Numerous witnesses testified that Hector H. Hickman was of sound mind at the time he executed the will. The jury found, however, that he was not of sound mind at that time and the question for determination is, whether the evidence justifies this finding. In determining this question, we may consider only the testimony favorable to the jury's verdict and must disregard all evidence to the contrary. Chambers v. Winn, 137 Tex. 444, 154 S. W.2d 454; Breeding v. Naler, Tex.Civ. App., 120 S.W.2d 888; Polser v. Polser, Tex.Civ.App., 179 S.W.2d 542, Ref.W.M.

Hector H. Hickman was 44 years of age at the time of his death on November 26, 1948. He was survived by his wife and infant child who are appellees in this case, and was seized and possessed of real estate and personal property of the probable value of $35,000. The purported will which the District Court denied probate was executed by him on August 25, 1948. By the terms of such will, Hector H. Hickman left all of his property to his three brothers who are appellants herein, and left nothing to his wife or child. There were two insurance policies on the life of Hector H. Hickman, one of about $7,500 payable to a

Mark McGee, Fort Worth, E. M. Davis, Gib Callaway, Brownwood, for appellants.

COLLINGS, Justice.

This appeal is from a judgment of the District Court denying probate of the will of Hector H. Hickman, deceased, after an appeal from a judgment of the County Court admitting such will to probate upon the application of appellants, Roy N. Hickman, Bernal B. Hickman and I. N. Hickman, who were named as independent executors under such will. Contestants of the will are appellees, Mrs. Hazel Hickman, individually and as next friend of

brother of deceased and another payable to his mother, but there was no insurance payable to his wife or to his minor child.

For many months prior to his death, Hector H. Hickman had been suffering from a cancerous condition which extended to almost all parts of his body, including portions of his head. He went to Scott & White Hospital at Temple, Texas, on two occasions in April and May of 1948 for an examination and treatment. At that time it was found that his condition was incurable. During July and August of 1948, he made several trips to Hoxey's Cancer Clinic in Dallas where he received medicine and treatment. On August 23rd and 24th he went to the Maxfield Clinic at Dallas where he was examined and X-ray pictures were taken of various parts of his body. He returned to Brownwood on August 25th where he executed the will in question and immediately went back to Dallas. He there received treatment at Baylor University Hospital and the Maxfield Clinic. By September 17, 1948, his mental state and his actions had become such that he was uncontrollable and was taken from the hospital which the evidence discloses was not prepared to take care of him in such condition. At that time, in the words of the doctor, he "didn't know exactly where he was, what time it was and at—times it was impossible to reason with him at all." There was other testimony to the effect that Hector H. Hickman was not of sound mind on occasions after September 17, 1948. Dr. O. N. Mayo who treated Hector H. Hickman while he was in the Medical Arts Hospital in Brownwood, at various times from October 7, 1948 until shortly before his death, testified; "I didn't know the patient before he came in on October 7th and I could not say for sure then about his mental condition in August. At the time he was in our hospital and under my care, his mental condition was disturbed."

Several X-ray pictures of portions of the body of Hector H. Hickman were taken during this period. One of such pictures taken under the direction of Dr. Mayo on October 7, 1948, was of a portion of Hickman's skull. Dr. Mayo also examined an X-ray picture of the skull of Hector H. Hickman taken by the Maxfield Clinic of Dallas on September 15, 1948. After an examination of the two X-ray pictures taken some three weeks apart he stated that they showed practically the same condition and that, in his opinion, there was very little change in the condition of Hickman's head and skull from August 25, 1948 to the time of the taking of the two X-ray pictures in September and October; that in his opinion the disease from which Hickman was suffering was of duration of "at least six months or a year, or longer."

Numerous witnesses testified that Hector H. Hickman was irrational and uncontrollable and to acts indicating a mental incapacity on or about September 17, 1948, and on occasions thereafter. Dr. S. W. Hughes testified in reply to a hypothetical question that in his opinion Hector H. Hickman was irrational on August 25, 1948, when he executed the will. The history of Hickman's illness as shown by the evidence, was sufficient basis for the opinion of Dr. Hughes that he was laboring under a mental incapacity at the time of the execution of the will.

The fact that Hector H. Hickman made no mention or provision in his will for his wife and infant child is of itself a circumstance to be taken into consideration, together with all other evidence in the case in determining his mental capacity to make the will in question. Renn v. Samos, 33 Tex. 760; Stone v. Grainger, Tex.Civ.App., 66 S.W.2d 484. Hector H. Hickman not only failed to provide for his wife and child in the will but informed his attorney who prepared the will that his wife and child were taken care of by insurance. The evidence shows that the wife and child were not beneficiaries under any insurance policy on the life of Hector H. Hickman and that the statement made to the attorney was a mistake.

Hector H. Hickman's irrational mental condition soon after the execution of the will is unquestioned. The testimony of his accompanying physical condition by reason of the cancerous growth extending to practically all parts of his body for a long period of time prior thereto, is likewise uncontradicted. The above facts are

sufficient as a basis for the testimony of Dr. Hughes, in answer to the hypothetical question presented to him, that Hickman was irrational on the date of the execution of the will. The unnatural disposition of Hickman's property under the will is likewise a fact which may be considered on the question of his mental capacity. In our opinion, this evidence, considered as a whole, justified a jury determination of the question of Hector H. Hickman's mental capacity to execute a valid will on August 25, 1948. 44 Tex.Jur., 574, 575; Chandler, et ux v. Weimers, Tex.Civ.App., 57 S.W.2d 585, Writ Ref.; Breeding v. Naler, supra; Walston v. Mabry, Tex.Civ.App., 225 S.W. 2d 1014; Buchanan v. Davis, Tex.Com. App., 12 S.W.2d 978; Id.; Tex.Civ.App., 300 S.W. 985; Polser v. Polser, supra; Cavanaugh v. Cavanaugh, Tex.Civ.App., 238 S.W. 1019.

In points 3, 4 and 5, appellants contend that the court erred in admitting X-ray photographs taken by the Maxfield Clinic purporting to be photographs of various parts of the body of Hector H. Hickman and a chart or history of Hickman's case kept by such clinic, alleged to be exhibits to and composing a part of the testimony of the witness, Dr. J. H. Maxfield, which was taken by oral deposition. The X-ray photographs were also used in connection with the testimony of other medical witnesses. Objections were made to the introduction of the photographs to the testimony concerning them and to the chart and history because they were never attached as exhibits to the deposition of Dr. Maxfield and had not been in the possession of the notary who took the deposition nor had such exhibits been filed with the District Clerk. It is urged by appellants that the fact that such exhibits were not attached to the deposition and certified and returned by the notary to the District Clerk along with and as a part of the deposition, was a violation of Rules Nos. 208 and 210, Vernon's Texas Rules of Civil Procedure.

The oral deposition of Dr. Maxfield was taken under an agreement of the attorneys for the parties hereto and provided that the signature of the witness was waived, that such deposition be taken, transcribed, certified to by the court reporter taking same, and returned informally into the District Court of Brown County. Dr. Maxfield's testimony as set out in such deposition indicated that it was his practice as a physician and the practice of his clinic to keep an official record of the history given by the patient as well as the doctor's findings and treatment; that such a record or history was kept concerning Hector H. Hickman and that the doctor had the original record in his possession at the time of the taking of the deposition and that he had taken X-ray pictures of various parts of the body of Hector H. Hickman and had these pictures in his possession at such time. All attorneys taking the doctor's deposition had opportunity to examine both the X-ray pictures and the original record or history kept at the clinic. The following question and answer testimony of Dr. Maxfield, together with comments and statements of attorneys are here set out as material to the point under consideration:

"29. I have requested that you make a copy of that record and furnish to us this morning as an exhibit to your deposition; have you completed such a copy of your record for that purpose? A. No; it has not been completed.

"30. Will you complete that record in the next few days and furnish to the reporter taking your deposition as an exhibit to and part of your deposition? A. Yes, we can finish it; I think it would be better to furnish photostatic copies rather than to give you a complete transcript typed out.

"Mr. McGee: We can't agree to that for we might want to cross examine him on his record.

"Mr. Callaway: He has the original here; you can use that to cross examine him.

"Mr. McGee: That will be all right if he has the original.

"31. Have you the record in your hands now; have the original record that you kept on Hector H. Hickman at the time he was your patient here? A. Yes, I have it.

"32. And for the purpose of my direct examination and for the purpose of cross

examination by counsel on the other side, we can have the original this morning? A. I don't know what you mean.

"33. I mean for the purpose of their examination of your record here this morning, and their cross examination of you? A. They may inspect it, yes.

"34. I did not mean for it to be carried away—

"Mr. McGee: What do you mean 'Inspect it'? A. You may inspect the information on the chart; but we will furnish copy of it and retain the original.

"35. Is that the record you hold in your hand there? A. Yes, sir; this is the record. (The record was handed to Messrs. McGee and Davis).

"36. Does that constitute all the written entries concerning the treatment in connection with your hospitalization of Hector H. Hickman? A. Yes.

"37. Now then, in connection with your treatment and diagnosis of Mr. Hickman, did you, during the intervals you have stated he was a patient of yours, take various X-ray pictures? A. Yes.

"38. You did take X-ray pictures? A. Yes; numerous radiographs were made.

"39. Do you have those X-ray pictures now in your possession here? A. Yes, they are in the file.

"40. I will now ask that those pictures be furnished to the reporter and retained by him as part of your deposition for the purpose of review during the trial and to be returned to you? A. It is customary in our clinic that we take small reproductions of the films, and I would like to take those for our records before they leave our file.

"41. You are in position to turn over to us, then, all those X-ray pictures? Or you will be? A. Yes; they are in our files and I could deliver those at the time I deliver the other record.

"42. On each of those pictures, is there a place in the corner of the picture showing the name of the patient and the date the picture was made? A. It is customary that each one carry typewritten data of the name and date, but sometimes, due to difficulties, it is obliterated or does not

show; but ordinarily each film carries the date and the name of the patient.

"43. And all of those you have made, that I have questioned you about and you are furnishing to us in connection with this deposition, either carry such identifications, or they were made during the interval asked about? A. All the pictures that we took of Mr. Hickman were made during that period of time between August 23rd and September 3rd, 1948.

"44. Now, were those pictures made either by you or under your direct supervision? A. They were made under our supervision.

"45. And they were made by competent persons taking the pictures, and made by up-to-date machinery; machinery supposed to correctly take such X-ray pictures; is that correct, Doctor? A. Yes.

"46. Dr. Maxfield, would you—at the time—at the beginning of your treatment of Mr. Hickman, did you not take from him a history? I believe that is what you call it. Did you take such a history by talking to him and getting what information you desired in regard to the condition you proposed to treat? A. A history is taken when a patient is first seen by some member of the staff; my brother, myself, or one of the externes or internes."

■ Mr. Calloway, attorney for contestants, testified in the trial of the case that the X-ray pictures were not delivered to the notary when the deposition was taken; that some days later he returned to Dr. Maxfield's office in Dallas and that the pictures and photostatic copy of the chart referred to were delivered to him by Dr. Maxfield; that he brought such document and pictures to Brownwood and had continuous possession thereof until he offered them in evidence in connection with Dr. Maxfield's deposition; that until that time they were never delivered to the notary nor filed in court as a part of the Maxfield deposition. The photographs were used also over appellants' objection, in connection with the testimony of Dr. J. H. Greenwood and Dr. O. N. Mayo. There is no contention by appellants that the exhibits were in any respect tampered with. They simply insist that the failure to observe and follow

the requirements of the Texas Rules of Civil Procedure is sufficient to require a reversal of the case. This contention would be well taken except for the agreement made by the attorneys that the deposition of Dr. Maxfield should be taken and returned informally into court. Although the agreement that the deposition was to be "informally returned" is indefinite and uncertain as to exact meaning and as to the intention of the parties to cover a fact situation such as here presented, the above quoted testimony of Dr. Maxfield and statements of the attorneys in connection therewith indicate that such was the intention. The doctor clearly indicated that although he had the original chart and history in his possession to be used and inspected by the attorneys in taking his deposition that he desired to retain the original for his files and to make copies of such exhibits to be used in the court trial. He also indicated a desire to retain the X-ray pictures in question until he could make miniature copies thereof to retain in his office. A careful reading of the above quoted excerpt from the deposition, in our opinion, indicates that appellants' attorneys were agreeable to the request of the doctor in this regard. The attorneys did not, by their language, specifically agree to the exact manner in which the copy of the record from the clinic and the X-ray pictures were brought into court, but it was clearly indicated that Dr. Maxfield was to retain the original record or history and furnish a copy thereof for court use and to retain the X-ray pictures until miniatures could be made for his own files. Since no specific manner of returning these exhibits into the court was set forth in the agreement, and since it was agreed that the deposition was to be "returned informally," we are of the opinion that the manner in which the exhibits were returned was a substantial compliance with the agreement and that the trial court did not err in admitting such X-ray pictures and history of Hector H. Hickman in evidence and in permitting medical testimony concerning such photographs. Utilities Indemnity Exchange v. Burks, Tex.Civ.App., 7 S.W.2d 1112; Missouri Pac. R. Co. v. Guillory, Tex.Civ.App., 28 S.W.2d 282.

Appellants' sixth and seventh points urge that the trial court erred in admitting the testimony of Hazel Hickman that proponents of the will asked her to not tell people the provisions of the will because they though it would be a reflection on Hector H. Hickman. Their tenth point claims error in the admission of testimony by Hazel Hickman that Bernal Hickman told her that she could not win; that a man had offered to testify that Hector had stated that he considered having a blood test made and that she, Hazel Hickman, told Bernal that his mother had been saying that the baby was not Hector's. Appellants contend that all of the above evidence was immaterial, irrelevant, occurred after the will was executed and was not pertinent to any issue in this case. One of the grounds on which the will was attacked was that proponents had, by the use of undue influence, induced Hector H. Hickman to execute the will excluding his wife and infant child from participation in his estate. In our opinion, evidence tending to show that proponents sought to keep the provisions of the will from the knowledge of the public and attempts to dissuade appellee from contesting the will were circumstances which could properly be considered by the jury in passing upon the issue of undue influence. The court did not err in overruling appellants' objections to such testimony.

Appellants' eighth, ninth and eleventh points complain of the admission by the court of testimony to the effect that there was insurance on the life of Hector H. Hickman in favor of his mother and one of his brothers but none in favor of his wife or infant child. In our opinion, the court did not err in admitting such testimony. Hector H. Hickman told the attorney who prepared his will that his wife and child had been taken care of by insurance. If this statement had been correct it would have explained his failure to include provisions in the will in favor of his wife and child and would not indicate an unnatural disposition of his property by the will. The evidence complained of by appellants tended to show this statement to be incorrect and was admissible for that purpose. It was material to the question of whether or not deceased had, in fact, made

a natural disposition of his property and to the question of whether or not he understood the disposition that was being made of his property. These points are overruled.

After the jury had retired and deliberated, they returned into court and submitted to the court the following question in writing: "In considering this evidence are we to assume that Hector Hickman was of sound mind until proven unsound or to consider him of unsound mind until he is proven sound?"

In response to the above question, the trial judge gave the following written instruction: "Gentlemen of the Jury: Replying to the above request hereto attached, you are instructed that in considering the evidence you are not to assume that Hector H. Hickman was either of sound or unsound mind, but you are to answer the issues from the evidence introduced in the case under the instructions of the court heretofore given you in his charge."

The appellants, in open court and prior to the delivery of the above instruction to the jury, made the following objections in writing:

"Proponents object to the charge given by the court in answer to the jury's question for the following reasons:

"1. It constitutes a supplemental and additional charge to the jury, and is not a proper charge to the jury in this case.

"2. It constitutes an instruction to the jury on how to answer Special Issue No. 1, and advises them how to answer the same, which issue is clear and unambiguous, and is a proper instruction to the jury on said issue, taken in consideration with other definitions and explanations in regard to said issue No. 1."

■ Appellants urge in their twelfth point that the court erred in overruling the above objections made to the instruction given by the court in answer to the question submitted by the jury. We cannot agree with this contention. The objections made by appellants to the instruction of the court to the jury were not well taken, and the court did not err in overruling same. Furthermore, if the instruc-

tion complained of should be held erroneous for the reasons urged, it was not hurtful but helpful to appellants. Appellants had the burden of proving the testator sane when he executed the will they offered for probate. Hudson v. Fuson, Tex.Civ.App., 15 S.W.2d 166; 44 Tex.Jur., 571, 572.

The judgment of the trial court is affirmed.

## On Motion For Rehearing

Appellants have presented an able motion for rehearing in which they particularly urge that we erred in overruling their third, fourth and fifth points and in holding that the trial court correctly overruled their objections to the introduction of the X-ray photographs and photostatic copy of the chart or history of Hector H. Hickman in connection with the oral deposition of Dr. J. H. Maxfield and the testimony of other medical witnesses. The basis of our holding was that the manner in which such exhibits were brought into court was a substantial compliance with the agreement of the attorneys that the deposition was to be "informally returned" when considered in connection with the testimony of Dr. Maxfield and statements by the attorneys as shown in his deposition.

It is contended in the motion that the conclusion reached by this court concerning the agreement differs from the terms of the agreement as construed by the court in that the agreement, as found by the court, contemplated that the deposition be certified to by the notary taking same, returned by him as a whole to the clerk of the district court of Brown County, Texas. The agreement made by the attorneys at the time of taking the deposition did provide that the "deposition be taken, transcribed, certified to" by the notary who took same and "returned informally into the District Court of Brown County." The deposition of the witness Dr. Maxfield was certified to by the notary and returned by him to the District Clerk except that the exhibits in question were not delivered to the notary when the deposition was taken, did not accompany the deposition when filed with the clerk and were not separately certified to. These exhibits were first de-

livered to the notary, who was also the court reporter, when they were brought into court by appellee's attorney, Mr. Callaway, and introduced in evidence at the trial. It is to be conceded that this procedure did not comply with the original agreement of the attorneys as above summarized.

It is our opinion, however, that the question and answer testimony of Dr. Maxfield, together with comments and statements of the attorneys in connection therewith, as heretofore set out, modified the original agreement. The doctor indicated a desire to retain the original of the chart or history in his possession rather than to deliver it to the notary and to make a copy thereof for use in connection with the deposition in court, and to retain the X-ray pictures until he could make miniature copies for his office records. We believe that the testimony of the doctor and statements of attorneys, as quoted in our original opinion, show that such attorneys were agreeable to the doctor's suggestion. There was no indication as to the exact manner or time for the copy of the chart and original X-ray pictures to be delivered to the notary as exhibits to and as a part of such deposition but we believe it is clear that it was agreeable to the attorneys for such exhibits to be delivered to the notary at a later date. Since it was agreed that the exhibits were not to be taken into possession by the notary (who was also the court reporter) at the time of taking the deposition and kept at all times thereafter with the deposition as a whole, but were to be delivered to him at a later time, the specific time and manner of which was not provided, and since the original agreement concerning the deposition was that it be "returned informally" we cannot see that the manner in which these exhibits were brought into court does appreciable violence to the agreement unless there was some question as to the authenticity of the exhibits. No contention is made that the X-ray pictures were not the same pictures identified and referred to in Dr. Maxfield's deposition nor is it urged that the photostatic copy of the chart introduced in evidence is not a copy of the original chart identified by Dr. Maxfield. Contestant's attorney, Mr. Callaway, testified that Dr. Maxfield delivered such exhibits to him a few days after the deposition was taken and that he brought them to his office in Brownwood and there had them in his possession until they were offered in connection with Dr. Maxfield's deposition. There is no question or suspicion raised concerning the authenticity of the exhibits and in the absence of such, no injury could have been suffered by appellants. We are also of the opinion that in the absence of any question concerning the authenticity of the exhibits there is no violation of the essence or spirit of the agreement between the attorneys as shown by the record.

The motion for rehearing is overruled.